## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RASHONNA RANSOM, on behalf of herself and all others similarly situated,** | Civ. No. 2:22-cv-01344 (WJM) |
| **Plaintiff,** | |
| v. | **OPINION** |
| **GREATPLAINS FINANCE, LLC d/b/a CASH ADVANCE NOW, and JOHN DOES 1-10,** | |
| **Defendants.** | |

Plaintiff Rashonna Ransom ("Plaintiff") alleges online lender Defendant GreatPlains Finance, LLC d/b/a Cash Advance Now ("GPF" or "Defendant") engaged in usurious payday loans. Defendant moves to dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(1) for lack of subject matter jurisdiction based on tribal sovereign immunity, for failure to join a necessary party under Rule 19(a), and alternatively, to dismiss John Doe defendants under Rule 21. ECF No. 51. The Court decides the matter without oral argument. Fed. R. Civ. P. 78(b). For the reasons below, Defendant's motion is **denied**.

## I.    BACKGROUND

Plaintiff obtained two separate loans from GPF. The first loan was on October 26, 2015 for $300 at an Annual Percentage Rate ("APR") of 652.36%. *See* Compl., ¶¶ 22, 25, ECF No. 1-2. She completed payment on that loan having paid over $1,578.34 in interest. *Id.* at ¶ 26. On April 18, 2016, Plaintiff borrowed $450 at an APR of 542.39%. *Id.* at ¶¶ 30-31. She paid over $2,474.23 in interest on the second loan, which still has an outstanding balance. *Id.* at ¶¶ 32, 34.

On October 25, 2021, Plaintiff filed a five-count state court action alleging unjust enrichment and violations of New Jersey's Consumer Finance Licensing Act, N.J.S.A. § 17:11C-3; Consumer Fraud Act, N.J.S.A. § 56:8-2; Criminal Usury Statute, N.J.S.A. § 2C:21-19; and Truth-in-Consumer Contract Warranty and Notice Act, N.J.S.A. § 56:12-15. Defendant removed this matter and then sought dismissal of the action based on arm of the tribe sovereign immunity. *See* ECF No. 4. After completing Court-ordered jurisdictional discovery, *see* ECF No. 10, Defendant renews its motion to dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(1), Rule 19, and Rule 21.

GPF

The Fort Belknap Indian Community (the "Tribe" or "FBIC") is a federally recognized American Indian tribal government in north central Montana. Decl. of Jeffrey Stiffarm ("Stiffarm Decl.") ¶ 2, ECF No. 53. On April 16, 2012, the Tribe established GPF under tribal law with the intent that GPF "enjoy the Tribe's sovereign immunity." Decl. of Evan Azure ("Azure Decl.") ¶¶ 7, 10, ECF No. 52; Art. of Organization, ECF No. 52-1. GPF is wholly owned by the Tribe through GVA Holdings LLC ("GVA") [1] and was initially managed by Dater Portfolio Management LLC ("Dater"), a non-tribal entity. Art. of Operation, ECF No. 52-2; Resolution 60-2012, ECF No. 52-3. The same day GPF was established, GPF entered into a "Servicing Agreement" with Cash Advance Servicing LLC ("CAS"), a non-tribal entity, to service GPF's loans. *See* Resolution 60-2012; Servicing Agreement, ECF No. 62-5. GFP is licensed by the FBIC Tribal Regulatory Authority and operates pursuant to the FBIC Tribal Online Lending Code. Azure Decl. ¶ 17.

In about 2017, the Tribe terminated GPF's contracts with Dater and CAS. *Id.* at ¶ 14. Since then, GPF has been exclusively managed by the Fort Belknap Planning and Development Corporation, d/b/a Island Mountain Development Group ("IMDG"), the economic development arm of the Tribe. *Id.* at ¶¶ 1, 15. All "profit participations" since 2017 from IMDG's investment in GPF were reinvested into GPF, *see* Subordination Agreement at GPF01383, ECF No. 62-10. GPF, however, asserts that since 2017, all of its "cash profitability" has gone to IMDG. Azure Decl. ¶ 16. IMDG makes all management decisions for GPF, including the language in loan documents, what interest rates are charged (subject to tribal law), parameters for loan approval, and what amounts GPF can lend to its customers. *Id.* at ¶ 15.

IMDG

IMDG is currently the sole manager of all Tribe lending entities,[2] as well as other tribally owned businesses. *Id.* at ¶¶ 1, 4; Pyette Dep. 12:1-4; IMDG Charter ¶ 4, ECF No. 53-2. IMDG is wholly owned by the Tribe and was created in 2006 to make "a profit on its operations to benefit the people of the Gros Ventre and Assiniboine Tribes of the Fort Belknap Indian Community." IMDG Charter ¶¶ 3, 4. IMDG has about 394 employees, of which roughly 243 are enrolled tribal members and 89 are enrolled members of other tribes. Azure Decl. ¶ 8. While GPF claims that it and other tribal businesses lease their employees

---

[1] GVA, established pursuant to tribal law, is wholly owned by the Tribe and was also managed by Dater. Azure Decl., ¶ 18, ECF No. 52; GVA Art. of Organization, ECF No. 52-4; GVA Art. of Operation, ECF No. 52-5.

[2] These online lending businesses include: Island Finance LLC; Aaniiih Nakoda Finance LLC dba Bright Lending; Green Trust Cash LLC dba Green Trust Lending; and Target Finance LLC dba Target Cash Now. *See* Pyette Dep. 16:10-20; *State of Minnesota v. Azure,* 23-cv-03321 (D. Minn.) (action by state to stop predatory lending); *Weidley v. Aaniiih Nakoda Finance, LLC,* 22-cv-905 (N.D. Ala.) (alleging violation of state lending and collection laws).

from IMDG, *id.*, GPF's Rule 30 (b)(6) corporate representative testified that GPF and none of the lending subsidiaries have ever had any employees. Pyette Dep. 87:13-88:4.

Online consumer lending generates approximately 90% of IMDG's revenue. Azure Decl. ¶ 7. IMDG distributes 20% of its net income to the Tribe. *Id.* at ¶ 5. IMDG's distributions to the Tribe typically account for approximately 75% of the Tribe's total non-federal tribal budget. Stiffarm Decl. ¶¶ 7-8. The remaining 80% of its net income is either directly reinvested in tribally owned businesses or spent on projects that have included the development and management of a wellness center for tribal members and $2.575 million on development of tribal member housing. Azure Decl. ¶ 6.

Newport Funding Loan

On November 23, 2021, GPF obtained a $10 million loan from various non-tribal lenders acting under the administrative agent Newport Funding, LLC ("NF"). Loan and Security Agreement ("NF Loan Agreement") at GPF00379, ECF No. 62-11. GPF designated Aaniiih Nakoda Servicing, LLC, a tribal entity, as master servicer and Carmel Solutions, LLC, ("Carmel") a non-tribal entity, as backup servicer. *See* Master Services Agreement, ECF No. 62-12. The NF Loan Agreement provides that certain "Adverse Tribal Actions" constitute default on the loan including: increasing or imposing any taxes, levy, charge or other payment obligation; amending the tribal laws in a manner that would be materially adverse to the lenders; restricting or eliminating the right of any borrower to conduct its business in a manner that would be materially adverse to the lenders. NF Loan Agmt. Art. 1 at GPF00362-365. Moreover, GPF is required under the Loan Agreement to first make payments to NF and Carmel before paying any tribal entities. *Id.* at ¶ 2.4, GPF00389-391. GPF's payments to NF include: an upfront fee of $100,000 to obtain financing; a monthly audit fee of $2,500 regardless of when any audits actually occur; 21% interest per annum on any outstanding loan balance; and a "facility fee" calculated based on the loan amount. *Id.* at ¶ 6.6, GPF00415; November 23, 2021 Fee Letter, ECF No. 62-13. GPF also must pay Carmel service fees of $4,500 per month and 3.5% on all unpaid balances on accounts. Master Services Agreement ¶¶ 1, 5 at GPF00854, GPF008548.

On January 19, 2023, the Tribe's elected governing body (the "Tribal Council"), replaced the IMDG Board after discovering alleged financial mismanagement. Dep. of Dana Pyette ("Pyette Dep.")[3] 59:14-60:7, ECF No. 62-1; Feb. 20, 2023 Updated Default Notice at GPF00841, ECF No. 62-16. A few days later, the CEO of IMDG, Terry Brockie, resigned. Feb. 20, 2023 Updated Default Notice at GPF00841. On January 20, 2023, NF declared an Event of Default and asserted the exercise of "immediate control" over GPF's financial accounts "until such time as [NF], in its sole discretion, has determined the Event of Default cured." January 20, 2023 Default Notice at GPF00840, ECF No. 62-16. NF

---

[3] Ms. Pyette is not a tribal member. Since 2012, she has been the part-time Chief Operating Officer and full time Chief Financial Officer for IMDG but has been serving in both capacities full time since 2017. Pyette Dep. 12:1-19.

directed financial institutions to "prevent the withdrawal, transfer, disposition of, or the exercise of any other form of dominion or control over associated Collateral without [NF's] prior written consent." *Id.* NF considered the replacement of the IMDG Board and loss of Mr. Brockie[4] as the "Key Man" to be Events of Default pursuant to various sections of the NF Loan Agreement including, *inter alia*: ¶ 8.1(m) (unauthorized "Change of Control or Management"), ¶ 8.1(p) (actions that create a "Material Adverse Effect"), and ¶ 8.1(q) ("any Adverse Tribal Action"). *Id.* During the continuation of an Event of Default, the NF Loan Agreement gives NF the Power of Attorney to, *inter alia*: indorse GPF's name "upon any and all checks, drafts, money orders and other instruments for the payment of money," execute in GPF's name any financing statements, amendments and schedules thereto that GPF is obligated to execute, or "do such other and further acts and deeds" in GPF's name that NF deems necessary to "make, create, maintain, continue, enforce, or perfect" NF's and each lender's lien on or rights in any collateral. NF Loan Agmt. ¶ 2.11 at GPF00397. The Event of Default remains unresolved. Pyette Dep. 61:14-24.

## II.    DISCUSSION

### A.  Rule 12(b)(1) Motion to Dismiss Standard and Tribal Sovereign Immunity

"Tribal sovereign immunity is a matter of subject matter jurisdiction, [citation omitted], which may be challenged by a motion to dismiss under Fed. R. Civ. P. 12(b)(1)." *E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1297, 1302–03 (10th Cir. 2001)). Where, as here, Defendant presents a factual attack on jurisdiction, the Court may consider evidence outside of the pleadings to determine whether subject matter jurisdiction exists. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176-77 (3d Cir. 2000). Unlike a facial attack, no presumption of truthfulness attaches to the plaintiff's allegations of jurisdictional facts in a factual attack. *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).

Tribal sovereign immunity can apply to governmental as well as commercial activities of the tribe both inside and outside Indian lands. *Michigan v. May Mills Indian Community,* 572 U.S. 782 (2014). Generally, the party invoking subject matter jurisdiction bears the burden of persuasion, but because sovereign immunity can be waived, "it does not implicate federal subject matter jurisdiction in the ordinary sense," and therefore, the entity claiming arm of tribal immunity bears the burden of proof. *In re Money Center of America, Inc.*, 565 B.R. 87, 96 (D. Del. 2017); *see also Williams v. Big Picture Loans, LLC,* 929 F.3d 170, 176-77 (4th Cir. 2019).

"A subdivision of tribal government or a corporation attached to a tribe may be so closely allied with and dependent upon the tribe that it is effectively an arm of the tribe. It is then actually a part of the tribe per se, and, thus, clothed with tribal immunity." *In re Star*

---

[4] Plaintiff refers to the termination of Mr. King as the "Adverse Tribal Action." Pl. Opp'n. Br. 17. Tracy Charles King is a former IMDG board chairman and president of the Tribal Council. Pyette Dep. 69:7-10.

*Grp. Communications, Inc.*, 568 B.R. 616, 625 (D.N.J. 2016) (internal quotes and citation omitted)). GPF insists that it is shielded by such arm of the tribe immunity. In contrast, Plaintiff argues that GPF is a nontribal lender that has affiliated itself with a Native American tribe in a "rent-a-tribe" scheme to avoid state usury laws. *See Bay Mills Indian Community*, 572 U.S. at 825 (Justice Scalia, dissenting) (noting payday lenders "often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality").

As the Third Circuit has yet to address what factors to consider to determine "arm of the tribe" tribal sovereign immunity, the Court will examine five of the six factors identified by the Tenth Circuit: "(1) the method of [the related entity's] creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the Tribe has over the entities; (4) whether the Tribe intended for them to have tribal sovereign immunity; (5) the financial relationship between the Tribe and the [related entity]." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1191 (10th Cir. 2010). The sixth factor - whether the purposes of tribal sovereign immunity are served by granting immunity - significantly overlaps with the other factors. *See Williams*, 929 F.3d at 177 (noting sixth factor's significant overlap with first five); *White v. Univ. of California*, 765 F.3d 1010, 1025 (9th Cir. 2014). Weighing the five *Breakthrough* factors, as explained below, the Court finds GPF is not an arm of the tribe.

### 1. Method of Creation

"Formation under tribal law weighs in favor of immunity, whereas formation under state law has been held to weigh against immunity." *Solomon v. American Web Loan*, 375 F. Supp. 3d 638, 653 (E.D. Va. 2019) (internal quotes and citation omitted). A court may also consider the "circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise." *Id.* (internal quotes and citation omitted). *See, e.g., Hunter v. Redhawk Network Security, LLC*, No. 17-0962, 2018 WL 4171612, at * 2-3 (D. Or. Apr. 26, 2018) (finding method of creation weighed against "arm of the tribe" immunity where entity was formed under Oregon law and existed as separate entity before being purchased by tribal business development corporation); *Solomon*, 375 F. Supp. 3d at 653-54 (finding first factor neutral where non-tribal entities were purchased and then merged into newly formed entity created under tribal law).

GPF was formed under tribal law and did not exist before the Tribe created it in 2012. The fact that CAS, as servicing agent, registered www.cashadvancenow.com and transferred it to GPF does not suffice to show that GPF "absorbed" or otherwise purchased CAS. In fact, the Tribe terminated the contracts with Dater and CAS in 2017. There is also no evidence that Dater or CAS was "the true driving force" that caused the Tribe to create GPF. *In re Internet Lending Cases*, 53 Cal. App. 5th 613, 626 (2020). This factor weighs in favor of finding arm of tribe sovereign immunity.

### 2. *Purpose*

"The second *Breakthrough* factor incorporates both the stated purpose for which the Entities were created as well as evidence related to that purpose." *Williams*, 929 F.3d at 178 (citing *Breakthrough,* 629 F.3d at 1192–93). Creating an entity for the purpose of financially benefitting the tribe and enabling it to "engage in various governmental functions" weighs "strongly" in favor of immunity. *Breakthrough,* 629 F.3d at 1192; *see, e.g., Pennsylvania by Shapiro v. Think Fin., LLC*, No. 14-7139, 2018 WL 4635750, at \*3 (E.D. Pa. Sept. 26, 2018) (noting sovereign immunity extended to entity whose purpose was to enhance tribe's economic self-sufficiency and serve social, economic, educational, and health needs of tribe). In evaluating this factor, the Court will examine the *current* purpose of the entity, rather than its purpose at creation as Plaintiff proposes. *See Iowa Tribe of Kansas and Nebraska v. Salazar*, 607 F.3d 1225, 1234 (10th Cir. 2010) (concluding "sovereign immunity is an ongoing inquiry" rather than a status that is frozen at the time a complaint is filed); *see, e.g., State v. Advance,* No. 05-143, 2012 WL 3113527, at \*6 (D. Colo. Feb. 18, 2012) ("What has happened in the past can of course be probative of the current state of affairs, but it is the current state of affairs that matters [to determine arm-of-the-tribe]"); *Kabakjian v. U.S.,* 267 F.3d 208, 212 (3d Cir. 2001) (noting court can permit destruction of subject matter jurisdiction after suit is filed).

Although GPF's purpose is not stated in the Articles of Organization, Defendant claims its purpose is to generate "additional revenues and economic opportunities for the tribal government and members." Azure Decl., ¶ 10. This purpose is belied by the record. First, Defendant's assertion that GPF leases employees from IMDG is contradicted by Ms. Pyette's 30(b)(6) testimony that none of the lending subsidiaries have ever had any employees. Second, while no case law provides that "a tribe must receive a certain percentage of revenue from a given entity for the entity to constitute an arm of the tribe," *Williams,* 929 F.3d at 180, here, there is *no* indication what GPF's "cash profitability" is that allegedly has gone to IMDG since 2017 or whether that amount is any meaningful portion of the Tribe's funding. Moreover, whether GPF currently has *any* profitability is questionable since under the NF Loan Agreement, GPF's revenue is distributed first to non-tribal entities. *See Solomon,* 375 F. Supp. 3d at 655 (finding tribe's receipt of "drastically smaller percentage" of revenue weighed heavily against sovereign immunity). Notably, there is no indication of what amount, if any, of the 20% of revenue that IMDG distributes to the Tribe comes from GPF rather than from any of its other online consumer lending companies. The second factor weighs against finding that GPF is an arm of the tribe.

### 3. *Structure, Ownership, and Management*

"The third *Breakthrough* factor examines the structure, ownership, and management of the entities, 'including the amount of control the Tribe has over the entities.'" *Williams,*

929 F.3d at 182 (citing *Breakthrough*, 629 F.3d at 1191). Although GPF is wholly owned by the Tribe and since 2017 was structured to be managed exclusively by the Tribe through IMDG, under the Event of Default, NF now exercises "immediate control" over GPF's financial accounts "until such time as [NF], in its sole discretion," determines the Event of Default to be cured. January 20, 2023 Default Notice. Contrary to Defendant's assertion that IMDG makes all of GPF's management decisions, those decisions are constrained by the Event of Default and Power of Attorney currently in effect. *See* NF Loan Agmt. ¶ 2.11; Feb. 20, 2023 Default Notice. *See also Solomon*, 375 F. Supp. 3d at 656 (finding tribal autonomy undermined by promissory note's requirements including provisions that deemed entity in default in the event of any "Adverse Tribal Government Action" or "Adverse Change of Tribal Law."); *Hunter*, 2018 WL 4171612, at *4 ("When a tribe owns an entity, but delegates most of the control of the entity to non-tribal members, that fact weighs against a finding of sovereign immunity."). Even if, as Defendant asserts, IMDG has "continued its normal business operations uninterrupted" under the current IMDG Board and CEO, *see* Def. Reply 9, n.6, that is not indicative of what entity maintains control of GPF. This factor currently weighs against finding immunity.

### 4. *Whether Tribe intended for GPF to Have Tribal Sovereign Immunity*

There is no dispute that the Tribe intended for GPF to share in its tribal sovereign immunity. *See* GPF Art. of Organization, ¶ 7; *see also* Loan Agreements at 4. This factor weighs in favor of treating GPF as an arm of the tribe.

### 5. *Financial Relationship Between Tribe and GPF*

As to the fifth factor, "the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 107 (1984)). A "suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain … .'" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (citations omitted); *Williams*, 929 F.3d at 184 ("the relevant inquiry evaluates the extent to which the Tribe depends on these Entities for revenue to fund its governmental functions and other tribal development").

To show financial impact, Defendant asserts that 90% of IMDG's revenues come from its online lending and that that constitutes 75% of the Tribe's total non-federal tribal budget. Even if GPF need not provide detailed accounting information, *see Williams*, 929 F.3d at 180, GPF offers no evidence as to what *its* contribution is to IMDG's online lending revenue. *See, e.g. Solomon*, 375 F. Supp. 3d at 658 (concluding that terms of promissory note granting tribe 3.6% of entity's revenue weighed against sovereign immunity); *Williams*, 929 F.3d at 185 (finding that judgment could significantly impact tribal treasury where 10% of tribe's funds came from entity). Without such proof, the Court cannot conclude that a judgment against GPF would meaningfully impact the Tribe or its treasury. *See Hunter*, 2018 WL 4171612, at *5 ("an 'entity must do more than simply assert that it

generates some revenue for the tribe in order to tilt this factor in favor of immunity.'" (citing *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 374 (Cal. 2016)). This factor weighs against tribal immunity.

In sum, the Court concludes that under the *Breakthrough* factors, GPF is not entitled to tribal sovereign immunity as an arm of the tribe.

### B. Fed. R. Civ. P. Rule 19

Rule 19(a) requires a party to be joined if: "(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest ...." Fed. R. Civ. P. Rule 19(a)(1)(B)(i). Where joinder of a necessary party is not feasible, the Court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *See* Fed. R. Civ. P. 19(b)(1)-(4). "A party asserting a Rule 19 dismissal bears the burden of showing 'that the person who was not joined is needed for a just adjudication.'" *Fitzgerald v. Wildcat*, No. 20-00044, 2023 WL 5345302, at *16 (W.D. Va. Aug. 18, 2023) (citing *Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005)).

Defendant claims that the Tribe is a necessary party because shuttering the Tribe's online consumer lending business would injure its economic interest - its treasury and funding of tribal governmental services. However, under Rule 19(a), "a party is only 'necessary' if it has a legally protected interest, and not merely a financial interest, in the action." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 230 (3d Cir. 2005) (internal quotes and citation omitted)); *see Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-7139, 2016 WL 183289, at *5 (E.D. Pa. Jan. 14, 2016) (rejecting claimed economic interests of tribes to be sufficient under Rule 19(a)). Even assuming that the Tribe has sovereign or contractual interests in this action, *see id.* at *5-6, Rule 19(a)(1)(B)(i) requires that disposing of the action in the Tribe's absence may "as a practical matter impair or impede" the Tribe's ability to protect its consumer online lending business. The phrase "as a practical matter" has "a restrictive as well as an expansive side. The fact that the absent person may be affected by the judgment does not of itself require his joinder if his interests are fully represented by parties present." *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1191 (3d Cir. 1979). Here, GPF's interest is to defend the legality of its loans, which substantially aligns with the Tribe's interest to continue its online lending business. *Think Fin., Inc.*, 2016 WL 183289, at *8.

Moreover, in contrast to breach of contract claims where all parties affected by the action may be indispensable, this action does not allege breach of contract, but violations of "statutory schemes analogous to tort law." *See Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 612 (M.D.N.C. 2014) (noting RICO and Unfair and Deceptive Trade Practices Act claims arise under "statutory schemes analogous to tort law"). *See, e.g., Think*

*Fin., Inc.,* 2016 WL 183289, at *7 (finding that claims of usurious and illegal lending practices in "rent-a-bank" scheme arose "under statutory scheme analogous to tort law" and that tribes were "akin to joint tortfeasors" and not necessary parties). Thus, the Tribe is at most a joint tortfeasor and not a necessary party. *See also Lomando v. United States,* 667 F.3d 363, 384 (3d Cir. 2011) ("it is well-established that Rule 19 does not require the joinder of joint tortfeasors." (internal quotes and citation omitted)).

Because GPF has not met its burden to establish that the Tribe is a necessary party under Rule 19(a), the Court need not perform a Rule 19(b) analysis– whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed" absent the Tribe. *See Abel v. Am. Art Analog, Inc.,* 838 F.2d 691, 695 (3d Cir. 1988); *Think Fin., Inc.,* 2016 WL 183289, at *3 ("The Court need not turn to Rule 19(b) if it determines the absent parties are not required under Rule 19(a).").

C. Fed. R. Civ. P. Rule 21

Defendant moves to dismiss all claims against putative John Doe defendants pursuant to Rule 21, which permits severing of parties and claims. Because Defendant presents no supporting argument or briefing on this issue, Defendant's motion is **denied.**

## III.  CONCLUSION

For the reasons noted above, Defendant's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), for failure to join a necessary party under Rule 19, and alternatively, to dismiss the John Does defendants under Rule 21 is **denied.**

WILLIAM J. MARTINI, U.S.D.J.

Date: January 22, 2024